COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Bumgardner and Clements
Argued at Richmond, Virginia


MARY AGNES JOSEPH TERRY

MEMORANDUM OPINION* BY
v.   Record No. 3322-01-2       JUDGE LARRY G. ELDER
JUNE 18, 2002

RICHMOND DEPARTMENT OF
 SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Melvin R. Hughes, Jr., Judge

Robert P. Dickinson for appellant.

Kate O'Leary, Assistant City Attorney
(Evelyn B. Meese, Assistant City Attorney;
Jack M. Fulton, Guardian ad litem for the
infant children; Office of the City Attorney,
on brief), for appellee.


Mary Agnes Joseph Terry (appellant) appeals from a decision

terminating her residual parental rights to her two daughters,

C. and D., under Code § 16.1-283(C)(2).  On appeal, she contends

the termination was erroneous both (1) because the Richmond

Department of Social Services (RDSS) failed to offer her the

services required by Code § 16.1-283(C)(2), and (2) because the

evidence was insufficient to prove that appellant, without good

cause, failed to substantially remedy the conditions that

resulted in the placement of the children in foster care.  We

        * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

hold the evidence was sufficient to prove both that RDSS offered appellant the services necessary to help her remedy the conditions that resulted in the placement and continuation of the children in foster care and that appellant failed, without good cause, to substantially remedy the conditions which caused that continuation. Thus, we affirm the involuntary termination of appellant's parental rights to C. and D.

"Code § 16.1-283 embodies the statutory scheme for the termination of residual parental rights in this Commonwealth." Lecky v. Reed, 20 Va. App. 306, 311, 456 S.E.2d 538, 540 (1995). Subsection (C)(2), the subsection under which the trial court terminated appellant's parental rights in this case, requires proof, by clear and convincing evidence, (1) that the termination is in the best interests of the child, (2) that "reasonable and appropriate" services have been offered to help the parent "substantially remedy the conditions which led to or required continuation of the child's foster care placement," and (3) that, despite those services, the parent has failed, "without good cause," to remedy those conditions.[1] Clear and convincing evidence is "'that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'"

---

[1] Appellant does not contest the sufficiency of the evidence to prove that termination was in the best interests of C. and D.

-

Martin v. Pittsylvania County Dep't of Soc. Servs., 3 Va. App. 15, 21, 348 S.E.2d 13, 16 (1986) (quoting Gifford v. Dennis, 230 Va. 193, 198 n.1, 353 S.E.2d 371, 373 n.1 (1985)).

We view the evidence in the light most favorable to the party prevailing below and grant to that evidence all reasonable inferences fairly deducible therefrom. Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991). We are mindful of the principle that "[t]he termination of residual parental rights is a grave, drastic and irreversible action," Helen W. v. Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991), but we "'presume[] [the trial court has] thoroughly weighed all the evidence [and] considered the statutory requirements,'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (quoting Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)).

The evidence in the record, viewed in the light most favorable to RDSS, proved, by clear and convincing evidence, both (1) that RDSS made "reasonable and appropriate efforts" to help appellant remedy the conditions "which led to or required continuation of the child[ren]'s foster care placement" and (2) that appellant, without good cause, failed "to substantially remedy" those conditions. In reaching this conclusion, the court was required by Code § 16.1-283(C)(2) to "take into consideration the prior efforts of such agencies to rehabilitate the parent."

-

The evidence established that RDSS had been working with appellant since 1994, when she inadequately supervised her ten-month-old baby, C. C. narrowly avoided drowning when she fell head-first into a bucket of water and detergent, and she suffered permanent developmental delays as a result. RDSS took C. into custody at that time. When appellant was incarcerated on criminal neglect charges stemming from C.'s injuries, she signed an entrustment agreement placing her one-month-old daughter D. in the custody of RDSS, as well. An evaluation of appellant conducted by Licensed Clinical Psychologist Beverly Chamblin after C.'s near drowning revealed that appellant was mildly mentally retarded with an IQ of 60, had "no indication of higher potential," and required long-term services in the home for parenting and household management.

Based on Dr. Chamblin's recommendations and case worker Rosalyn Johnson's observations, RDSS provided appellant with help in performing routine personal hygiene and household chores. RDSS also attempted to find assistance for appellant in managing her affairs and raising her children. Although RDSS arranged for appellant to live with a relative in New York or enter a residential placement program in Richmond, appellant declined to move to New York and disqualified herself from participating in the residential program in Richmond when she chose to get married instead. RDSS recommended the children be placed for adoption, but when a court disapproved of that

-

recommendation, RDSS was forced to attempt to return the children to appellant. Johnson testified that she had already referred appellant to mental retardation services as well as in-home services, thereby exhausting all avenues at her disposal for "improv[ing] [appellant's] functioning." Johnson referred appellant to RDSS's stabilization services, and appellant continued to receive in-home services. RDSS approved returning the children to appellant's home on a trial basis, and six months later, appellant regained legal custody. Appellant stipulated that RDSS provided her with "excellent services" between April 1994 and March 1997.

Prior to the return of C. and D. to appellant's home in 1997, appellant was charged with criminal neglect of A., her niece, who was severely burned in hot water while under appellant's care. In 1999, appellant violated a condition of her probation on that charge when she refused to attend parenting classes, and RDSS was forced to resume custody of C. and D. when appellant was incarcerated on the probation violation. Appellant made arrangements to leave C. and D. with a male friend, but appellant left the children without legal guardianship, and her male friend was unable to care for the children properly. Once the children came back into the custody of RDSS, it was discovered that at least one of them had been sexually abused while in appellant's custody.

We recognize that it was appellant's second incarceration, at least in part, which "led to" the children's second foster care placement and that incarceration alone is insufficient grounds for terminating one's parental rights. See, e.g., Cain v. Roanoke Dep't of Soc. Servs., 12 Va. App. 42, 44, 402 S.E.2d 682, 683 (1991). Here, however, more than appellant's 1999 incarceration "required continuation of the child[ren]'s foster care placement." Code § 16.1-283(C)(2) (emphasis added). Appellant's incarceration merely brought to the attention of RDSS other facts which, when viewed in light of appellant's history with RDSS, "required [that] continuation." Id.; see Harris v. Lynchburg Div. of Soc. Servs., 223 Va. 235, 242, 288 S.E.2d 410, 413 (1982) (holding that mother's four-year history of neglectful treatment prior to her incarceration permitted termination of her parental rights while she was in prison).

First, the reason behind appellant's incarceration, her failure to take parenting classes as a condition of probation following her conviction for neglecting her niece, A., related directly to appellant's ability to parent C. and D. Second, appellant failed to provide adequately for the children's well-being during her incarceration both because the person to whom she entrusted them was unable to care for them and because she failed to provide for the children's legal guardianship. Third, the fact that one or both of the children had been sexually abused while in appellant's custody indicated that

-

appellant had failed to keep them safe prior to her incarceration. Fourth, the evidence established that appellant's children had special needs and that appellant required ongoing assistance to parent them effectively and maintain a household.

The evidence, viewed in the light most favorable to RDSS, established that it made "reasonable and appropriate efforts" to help appellant remedy the conditions which both "led to" and "required continuation of" the girls' foster care placement in 1999. Code § 16.1-283(C)(2). A repeat psychological evaluation performed in 2000 indicated that appellant's intellectual and functional abilities had not improved since her last testing in 1994, and on the recommendation of Dr. Chamblin, the evaluating psychologist, RDSS attempted to reinstitute the services which had allowed appellant to improve her functioning and regain custody in 1997. However, Dr. Chamblin opined that, whereas appellant had been "accepting of supervision" and receptive to training in 1994, appellant was more "defensive and guarded" in 2000.

In keeping with Dr. Chamblin's analysis, the evidence established that appellant declined almost all services offered by RDSS following her release from jail in late 1999 or early 2000.[2] After appellant underwent the psychological evaluation in

---

[2] The only services appellant accessed were employment-related, and the evidence established that appellant

-

June 2000, RDSS, through the Richmond Behavioral Health

Authority (RBHA), "offered services to [appellant,] and she

declined because she felt she did not need any.  RBHA was

offering daily in-home support services such as money

management/payee assistance, parenting skills and mental

retardation services."  RDSS filed a foster care plan with a

goal of adoption in July 2000 because no relatives suitable for

placement had been found, appellant was unable to parent

successfully without supervision, and appellant had not accessed

the services that were offered to her.  Despite the possibility

of the termination of her parental rights, appellant did not

access any in-home services prior to the district court

termination hearing in March 2001.

The evidence appellant offered showing payment of $205 to

the "City of Richmond, Collection Division," for water tended to

indicate appellant was still having trouble managing her

finances.  As case worker Shannon Crone testified, appellant

received social security disability benefits, and appellant's

ongoing difficulty in paying her bills "was never [a question

of] her [not] having enough . . . money . . . ."  As of the

circuit court hearing in September 2001, appellant testified

─────────────────

worked only sporadically.  We do not, however, consider
appellant's employment status to be of great importance to the
termination of her parental rights.  Although case worker Davis
testified appellant was referred for assistance in maintaining
employment, this was not listed as a requirement in the
applicable foster care plans.

merely that she was "[i]n the process" of obtaining mental retardation services from RBHA, services she had failed to access for over a year.

Thus, the evidence established that RDSS, through RBHA, offered appellant all services it thought necessary to permit her to regain custody but that she declined almost all of those services. RDSS was not required "to force its services upon an unwilling or uninterested parent." Harris, 223 Va. at 243, 288 S.E.2d at 415. Further, the failure of RDSS or RBHA to ask appellant to participate in the children's counseling was not dispositive. No evidence established that such participation would be beneficial to appellant or her daughters in remedying the conditions requiring foster care placement. Further, Dr. Chamblin opined that appellant would not benefit personally from psychotherapy. Finally, as outlined above, RDSS and RBHA offered appellant a variety of other services which she failed to access.

Additional evidence established that appellant was not able to keep her children safe or to parent them effectively without the assistance offered her. When appellant was released from jail in late 1999 or early 2000, she initially maintained close contact with her children, and regular visits "were going well." However, when case worker Kelly Davis allowed an overnight visit in appellant's home, appellant again demonstrated her inability properly to supervise and protect her children. Appellant left

-

the girls with her boyfriend while she went to work, and appellant's boyfriend sexually abused C. and threatened D. C. "said she tried to tell her mother, [appellant,] but [appellant] would not listen to [C.]." As a result of that incident, appellant's subsequent visits were to be supervised.

When a new case worker, Shannon Crone, permitted appellant an unsupervised visit with the children to take them to a Christmas parade, appellant violated Crone's specific instruction that "it was just to be [appellant] and the girls." In violating that instruction, appellant allowed the girls to be in the presence of D.'s father, Robert Terry, who was alleged to have sexually abused D. previously. Appellant's supervised visits with the girls were sporadic after that, from January to March 2001. When appellant notified Crone in late February 2001 that she would be working on Saturdays and requested a different visitation schedule be established, Crone attempted to contact appellant, but appellant "never returned" Crone's call to arrange visitation.

Other evidence established that the girls had special needs and that appellant required ongoing assistance to parent them. C. was an "extremely hyperactive" child with "borderline mental retardation," and C. required "[c]onsiderably more" supervision than the average child "just in regards to safety." The evidence also established that C. and D., victims of sexual abuse, exhibited "sexualized behavior" that required a "higher

-

level" of parenting skills than required by the average child. Finally, C.'s therapist testified that C. and D. together exhibited "distractibility . . . the most extreme [she had] ever seen" in twelve years of practice. Dr. Chamblin testified that appellant required ongoing assistance to parent the children, and even appellant's expert, social worker Dan Jacobson, agreed appellant would require ongoing assistance in "[a]dapting to providing [for] the changing needs of an adolescent . . . who has been sexually abused." Appellant, on the other hand, testified that she no longer needed any help parenting her children, a conclusion clearly belied by the evidence.

This case, as presented on appeal, is not one in which the parent's mental deficiency, standing alone, rendered the parent "unable," "without good cause," to "substantially remedy" the conditions requiring foster care placement. Code § 16.1-283(C)(2) (emphasis added); see Richmond Dep't of Soc. Servs. v. L.P., 35 Va. App. 573, 582-85, 546 S.E.2d 749, 753-55 (2001) (holding that severe and likely permanent mental deficiency which prevented parent from caring for child did not constitute good cause preventing court from terminating parental rights under Code § 16.1-283(C)(2)). Although appellant's children had special needs and appellant's disability clearly had a negative impact on her ability to care for them, the evidence established that the termination of appellant's parental rights resulted from her "unwilling[ness]" to recognize

-

her limitations and to accept the services and guidance offered by RDSS to help her "substantially remedy the conditions which led to or required continuation of the child[ren]'s foster care placement." Code § 16.1-283(C)(2) (emphasis added). As Dr. Chamblin testified, "Many people with an IQ of 60[, appellant's IQ,] function very, very well . . . . There are two issues: The intellectual function, and how the person uses it."

In summary, the evidence established that RDSS offered appellant a panoply of services designed to assist her in regaining custody of her children. Appellant declined the bulk of those services until her parental rights had already been terminated by the district court, and she showed a continuing inability to protect her children. The evidence, viewed in the light most favorable to the RDSS, established that her children had special needs which a parent of normal intellectual function would have difficulty meeting and that appellant could not hope to parent adequately without the assistance she repeatedly had refused. Thus, the evidence supported the drastic action of terminating her parental rights to C. and D. pursuant to Code § 16.1-283(C)(2), and we affirm the ruling of the trial court.

                                                    Affirmed.

                                     -